# In the United States Court of Appeals
# For the District of Columbia Circuit

_____

NO: 14-5187

_____

SAMUEL ZOOK, MICHELLE McCLAIN-KRUSE,
BIRGITTA MEADE, and ANNETTE LAITINEN,

      Plaintiffs-Appellants,

vs.

GINA McCARTHY and the UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

      Defendants-Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
HONORABLE RICHARD J. LEON, JUDGE

_____

APPELLANTS' BRIEF AND ARGUMENT

_____

WALLACE L. TAYLOR
Law Offices of Wallace L. Taylor
118 3rd Ave. S.E., Suite 326
Cedar Rapids, Iowa 52401
319-366-2428;(Fax)319-366-3886
e-mail: wtaylorlaw@aol.com

ATTORNEY FOR PLAINTIFFS-APPELLANTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to the D.C. Circuit Rules 15(c)(3) and 28(a)(1), the Plaintiffs-Appellants hereby submit this certificate as to parties, rulings, and related cases.

**Parties and Amici**

Plaintiffs-Appellants

The Plaintiffs-Appellants in this appeal are Samuel Zook, Michelle McClain-Kruse, Birgitta Meade, and Annette Laitinen.

Defendants-Appellees

The Defendants-Appellees in this appeal are Gina McCarthy and the United States Environmental Protection Agency.

Amici

At this point there are no amici in this case.

**Rulings**

The ruling under review in this proceeding is the ruling of the United States District Court for the District of Columbia, entered on June 28, 2014, granting the Defendants' Motion to Dismiss.

**Related Cases**

This case has not been previously before this Court, nor any other court except the district court from which

i

this appeal is taken. There are no related cases in this appeal.

/s/ *Wallace L. Taylor*

_____

WALLACE L. TAYLOR

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES     i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . .     iv

GLOSSARY OF ABBREVIATIONS. . . . . . . . . . . . . . . .     vii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . .     1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . .     1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . .     3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . .     4

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . .     10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .     11

      I.    THE DEFENDANTS HAVE A NONDISCRETIONARY DUTY
TO LIST AMMONIA AND HYDROGEN SULFIDE AS
REGULATED POLLUTANTS AND TO LIST AFOs AS
STATIONARY SOURCES UNDER THE CLEAN AIR ACT. . . .     11

      A. Standard of Review . . . . . . . . . . . . . .     11

      B. Statutory and Regulatory Framework . . . . . .     12

      C. Argument . . . . . . . . . . . . . . . . . . .     17

            1.    Non-Discretionary Duty . . . . . . . . .     17

            2.    EPA's Duty to Make Endangerment Findings     20

            3.    The Decision of the District Court . . .     35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .     37

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . .     40

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . .     40

**TABLE OF AUTHORITIES**

<u>Page</u>

**I. JUDICIAL DECISIONS**

<u>Aid Ass'n. for Lutherans v. U.S. Postal Serv.</u>,
    321 F.3d 1166 (D.C. Cir. 2003). . . . . . . . . .   30

<u>Allied Pilots Ass'n. v. Pension Benefit Guar. Corp.</u>,
    334 F.3d 93 (D.C. Cir. 2003). . . . . . . . . . .   19

<u>Am. Lung Ass'n. v. Reilly</u>,
    962 F.2d 258 (2d Cir. 1992) . . . . . . . . . . .   23,
                                                      24,32

<u>Am. Scholastic TV Programming Found. v. FCC</u>,
    46 F.3d 1173 (D.C. Cir. 1995) . . . . . . . . . .   29

<u>Am. Trucking Ass'ns. v. EPA</u>,
    175 F.3d 1027 (D.C. Cir. 1999). . . . . . . . . .   23

<u>American Lung Ass'n. v. EPA</u>,
    134 F.3d 388 (D.C. Cir. 1998) . . . . . . . . . .   16

<u>Bennett v. Spear</u>,
    520 U.S. 154, 117 S.Ct. 1154 (1997) . . . . . . .   19

<u>Bell Atl. Tel. Cos. v. FCC</u>,
    131 F.3d 1044 (D.C. Cir. 1997). . . . . . . . . .   29

<u>Browning v. Clinton</u>,
    292 F.3d 235 (D.C. Cir. 2002) . . . . . . . . . .   12

* <u>Center for Biological Diversity v. EPA</u>,
    794 F.Supp.2d 151 (D.D.C. 2011) . . . . . . . . .   20,
                                                 28,30,31,35,36

<u>Chevron, U.S.A., Inc. v. NRDC</u>,
    467 U.S. 837, 104 S.Ct. 2778 (1984) . . . . . . .   30

Authorities upon which we chiefly rely are marked with
asterisks.

iv

Page

Environmental Defense Fund v. Thomas,
    870 F.2d 892 (2d Cir. 1989) . . . . . . . . . .22,23

Ethyl Corp. v. EPA,
    541 F.2d 1 (D.C. Cir. 1976) . . . . . . . . . .  30

Fort Stewart Sch. V. FLRA,
    495 U.S. 641, 110 S.Ct. 2043 (1990) . . . . . . .  29

* Friends of the Earth v. EPA,
    934 F.Supp.2d 40 (D.D.C. 2013). . . . . . . . . . 20,
                    21,22,23,24,25,26,27,28,32,34,35

Massachusetts v. EPA,
    549 U.S. 497, 127 S.Ct. 1438 (2007) . . . . . . .  30

Nat'l. Cable & Telecomms. Ass'n. v. FCC,
    567 F.3d 659 (D.C. Cir. 2009) . . . . . . . . .  29

* NRDC v. Train,
    545 F.2d 320 (2nd Cir. 1976). . . . . . . . . .  25,
                            26,31,36

Porto Rico Ry., Light & Power Co. v. Mor,
    253 U.S. 345, 40 S.Ct. 516 (1920) . . . . . . .  21

Roberts v. Sea-Land Servs. Inc.,
    132 S.Ct. 1350 (2012) . . . . . . . . . . . .  29

Robinson v. Shell Oil Co.,
    519 U.S. 337, 117 S.Ct. 843 (1997). . . . . . . .  28

Rochon v. Gonzales,
    438 F.3d 1211 (D.C. Cir. 2006). . . . . . . . . .  38

Sierra Club v. EPA,
    551 F.3d 1019 (D.C. Cir. 2008). . . . . . . . . .  29

Sierra Club v. Leavitt,
    355 F.Supp.2d 544 (D.D.C. 2005) . . . . . . . .  23

Sierra Club v. Thomas,
    828 F.2d 783 (D.C. Cir. 1987) . . . . . . . . .  27

Page

**II. STATUTES AND RULES**

40 C.F.R. § 122.23 . . . . . . . . . . . . . . . .     4

42 U.S.C. § 7411(a)(3) . . . . . . . . . . . . .     16

42 U.S.C. § 7571(a)(2)(A). . . . . . . . . . . . .20,28

42 U.S.C. § 7602(g). . . . . . . . . . . . . .     13

42 U.S.C. § 7602(h). . . . . . . . . . . . . .     16

\* 42 U.S.C. § 7604 . . . . . . . . . . . . . . 10,16-
                                            17,19,20,32,33,35,36

42 U.S.C. § 7604(a)(2) . . . . . . . . . . . . .     19

42 U.S.C. § 7571(a)(2)(A). . . . . . . . . . . . .20,28

Federal Rule of Civil Procedure 12(b)(6) . . . . . .     11

\* Section 108 of the Clean Air Act, 42 U.S.C. § 7408 .   10,
                11,12-13,15,16,18,22,25,26,29,34

Section 109 of the Clean Air Act, 42 U.S.C. § 7409 .   10,
                11,13-15,18,19,22,29,34

\* Section 111 of the Clean Air Act, 42 U.S.C. § 7411 .   15-
                16,18,19,22,29,34

**III. OTHER AUTHORITIES**

Pew Commission on Industrial Farm Animal
    Production, Putting Meat on the Table:
    Industrial Farm Animal Production in America
    (Washington, DC: Pew Charitable Trusts and
    Johns Hopkins Bloomberg School of Public
    Health, 2008), p. 23. . . . . . . . . . . . . . . 6-7

U.S. Cong. & Admin. News, V. 3, p. 5360 (1970) . . .   31

vi

**GLOSSARY OF ABBREVIATIONS**

AFO                     animal feeding operation

CAFO                    concentrated animal feeding operation

EPA                     Environmental Protection Agency

NAAQS                   National Ambient Air Quality Standards

NAEMS                   National Ambient Emission Monitoring
                        Study

## JURISDICTIONAL STATEMENT

This case was filed in the United States District Court for the District of Columbia pursuant to 42 U.S.C. § 7604. A final judgment was entered granting the Defendants' motion to dismiss on June 28, 2014. A Notice of Appeal was filed on July 28, 2014. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

**I. THE DEFENDANTS HAVE A NONDISCRETIONARY DUTY TO LIST AMMONIA AND HYDROGEN SULFIDE AS REGULATED POLLUTANTS AND TO LIST AFOs AS STATIONARY SOURCES UNDER THE CLEAN AIR ACT.**

Aid Ass'n. for Lutherans v. U.S. Postal Serv., 321 F.3d 1166 (D.C. Cir. 2003)

Allied Pilots Ass'n. v. Pension Benefit Guar. Corp., 334 F.3d 93 (D.C. Cir. 2003)

Am. Lung Ass'n. v. Reilly, 962 F.2d 258 (2d Cir. 1992)

Am. Scholastic TV Programming Found. v. FCC, 46 F.3d 1173 (D.C. Cir. 1995)

Am. Trucking As. v. EPA, 175 F.3d 1027 (D.C. Cir. 1999)

American Lung Ass'n. v. EPA, 134 F.3d 388 (D.C. Cir. 1998)

Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154 (1997)

Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044 (D.C. Cir. 1997)

Browning v. Clinton, 292 F.3d 235 (D.C. Cir. 2002)

Center for Biological Diversity v. EPA, 794 F.Supp.2d 151 (D.D.C. 2011)

Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778 (1984)

Environmental Defense Fund v. Thomas, 870 F.2d 892 (2d Cir. 1989)

Ethyl Corp. v. EPA, 541 F.2d 1 (D.C. Cir. 1976)

Fort Stewart Sch. V. FLRA, 495 U.S. 641, 110 S.Ct. 2043 (1990)

Friends of the Earth v. EPA, 934 F.Supp.2d 40 (D.D.C. 2013)

Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438 (2007)

Nat'l. Cable & Telecomms. Ass'n. v. FCC, 567 F.3d 659 (D.C. Cir. 2009)

NRDC v. Train, 545 F.2d 320 (2nd Cir. 1976)

Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 40 S.Ct. 516 (1920)

Roberts v. Sea-Land Servs. Inc., 132 S.Ct. 1350 (2012)

Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843 (1997)

Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006)

Sierra Club v. EPA, 551 F.3d 1019 (D.C. Cir. 2008)

Sierra Club v. Leavitt, 355 F.Supp.2d 544 (D.D.C. 2005)

Sierra Club v. Thomas, 828 F.2d 783 (D.C. Cir. 1987)

40 C.F.R. § 122.23

42 U.S.C. § 7411(a)(3)

42 U.S.C. § 7571(a)(2)(A)

42 U.S.C. § 7602(g)

42 U.S.C. § 7602(h)

42 U.S.C. § 7604

42 U.S.C. § 7604(a)(2)

42 U.S.C. § 7571(a)(2)(A)

Federal Rule of Civil Procedure 12(b)(6)

Section 108 of the Clean Air Act, 42 U.S.C. § 7408

Section 109 of the Clean Air Act, 42 U.S.C. § 7409

Section 111 of the Clean Air Act, 42 U.S.C. § 7411

Pew Commission on Industrial Farm Animal Production, Putting Meat on the Table: Industrial Farm Animal Production in America (Washington, DC: Pew Charitable Trusts and Johns Hopkins Bloomberg School of Public Health, 2008), p. 23

U.S. Cong. & Admin. News, V. 3, p. 5360 (1970)

## STATEMENT OF THE CASE

The Plaintiffs brought this case in the United States District Court for the District of Columbia pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604. The Plaintiffs alleged that EPA has a non-discretionary duty under the Clean Air Act to list ammonia and hydrogen sulfide as regulated air pollutants under the Clean Air Act and to list AFOs as stationary sources of

3

pollution to be regulated under the Clean Air Act (App. p. 15-17).

The Defendants filed a motion to dismiss the Plaintiff's Complaint, alleging that the EPA does not have a non-discretionary duty as alleged by the Plaintiffs (App. p. 37). On June 28, 2014, the district court granted the Defendant's motion and entered judgment dismissing the Plaintiffs' Complaint (App. p. 49).

Plaintiffs filed a Notice of Appeal on July 28, 2014 (App. p. 50).

## STATEMENT OF THE FACTS

The Plaintiffs are residents of Winneshiek County, Iowa, who previously attended North Winneshiek School, currently teach at the school, or have children who attend the school (App. p. 7-8). The school is near several animal feeding operations.

A description and definition of animal feeding operations is found in EPA regulations at 40 C.F.R. § 122.23. An animal feeding operation is an open feed lot or a confinement building, as well as the crop fields where manure from the livestock is applied, where animals are confined and fed or maintained for a total of 45 days or more in any 12-month period and there are no crops,

4

vegetation, forage growth, or post-harvest residue in the area in and around the lot or confinement building.

An animal feeding operation is designated as a concentrated animal feeding operation (CAFO) based primarily on the number of animals present, e.g., more than 2,500 hogs, 1,000 beef cattle, 700 dairy cattle, 125,000 chickens. It is the concentration of animals that causes the problems of air and water pollution.

CAFOs usually have more than the minimum number of animals to qualify as CAFOs. It is common for hog confinement operations to have as many as 10,000 hogs, and it is not uncommon to have as many as 20,000-30,000 animals. Beef cattle in open feedlots can number as many as 4,000-5,000 head.

Manure from open feedlots is collected in piles on a short-term basis and then applied to the land. Manure from confinement operations is usually collected in large pits under the facility. The manure is then emptied once or twice a year and applied (or over applied) to crop fields.

During the time that the manure is in the piles or in the pits, it is undergoing anaerobic digestion, constantly generating and sending poisonous sewer gases into the air. But unlike a municipal sewage treatment plant, the animal waste is not treated and the pollutants are not diluted.

Thus, the manure from hogs, which is 5 times more polluting than human waste, in a 10,000 head CAFO is the same as the waste from a city of 50,000 people, without the pollution control treatment. This is like a third-world country that does not treat its waste and allows it to pollute the air and the water. We would never allow that quantity of human sewage to sit in an open pit without treatment for up to 12 months and then allow it to be dumped on farm fields without being treated, yet that is exactly what is happening with animal sewage.

As the Pew Commission on Industrial Farm Animal Production described it:

> Decomposing manure produces at least 160 different gases, of which hydrogen sulfide ($H_2S$), ammonia, carbon dioxide, methane, and carbon monoxide are the most pervasive. These gases may seep from pits under the building or they may be released by bacterial action in the urine and feces on the confinement house floor. Possibly the most dangerous gas common to industrial food animal production (IFAP) facilities is hydrogen sulfide. It can be released rapidly when the liquid manure slurry is agitated, an operation commonly performed to suspend solids so that pits can be emptied by pumping. During agitation, hydrogen sulfide levels can soar within seconds from the usual ambient levels of less than 5 ppm to lethal levels of over 500 ppm. Animals and workers have died or become seriously ill in swine industrial farm animal production (IFAP) facilities when hydrogen sulfide has risen from agitated manure in pits under the building. Hydrogen sulfide exposure is most hazardous when the manure pits are located beneath the houses, but an acutely toxic environment can result if gases from outside storage facilities backflow into a building (due to inadequate gas traps or other design faults) or if a

worker enters a confined storage structure where gases have accumulated.

Pew Commission on Industrial Farm Animal Production, Putting Meat on the Table: Industrial Farm Animal Production in America (Washington, DC: Pew Charitable Trusts and Johns Hopkins Bloomberg School of Public Health, 2008), p. 23.

AFOs, especially those classified as CAFOs, have significantly increased in numbers in Iowa, and nationally, over the past 20 years. Scientific studies over the past several years have confirmed that emissions of pollutants from AFOs, such as ammonia, hydrogen sulfide, particulate matter, and volatile organic compounds, cause health effects on people near AFOs. Some of these studies have specifically studied AFOs in Iowa, and one study was even focused on North Winneshiek School.

In 2001, the Emission Standards Division of the Environmental Protection Agency issued a report documenting the nature and effects of air emissions from AFOs (App. p. 9). In 2002, a team of scientists from Iowa State University and the University of Iowa completed a report on air emissions from AFOs. The authors of the report made a recommendation, based on their review of credible AFO emissions research, that EPA should regulate certain

7

pollutants released from AFOs – namely ammonia, hydrogen sulfide, and odor – under the Clean Air Act (App. p. 9).

Also, in 2002, the Ad Hoc Commission on Air Emissions From Animal Feeding Operations, issued a report documenting the health effects of air pollutants from CAFOs. This report was funded in part by a contract between the National Academy of Sciences and the Environmental Protection Agency (App. p. 10).

In 2003, a report was released in Missouri reporting the results of an ammonia exposure investigation in a community near a large swine CAFO. Monitoring results from six houses showed ammonia levels above the minimal risk levels. In response, EPA issued a memo stating that "the conclusion could be drawn that a public health hazard did exist at the time the . . . data was acquired." (App. p. 10).

In 2006, results were published of a study of asthma in children at two elementary schools in Iowa. One of the schools was near a hog CAFO and the other school was at least 10 miles from the nearest CAFO. As it turns out, the school near the CAFO was North Winneshiek School. The study found a significantly higher rate of asthma among children in North Winneshiek School than in the other school (App. p. 10).

In 2008, the Pew Commission on Industrial Farm Animal Production released a comprehensive report on the impacts of industrial livestock production. This report concluded that "EPA should develop a standardized approach for regulating air pollution" from AFOs under the Clean Air Act (App. p. 10-11).

In 2009, researchers from the University of Georgia released the results of a study of ammonia concentrations in the ambient air near poultry houses. The study indicated that just one broiler CAFO with fewer than 100,000 birds can cause ambient ammonia levels to exceed chronic and acute health exposure limits (App. p. 11).

Pursuant to an agreement between EPA and the livestock industry in 2005, the industry funded a study of air emissions from AFOs. The results of this National Air Emissions Monitoring Study (NAEMS) were published in January of 2011. That data showed levels of ammonia, particulate matter, and hydrogen sulfide in excess of federal air quality standards (App. p. 11).

In 2011, a study was conducted in 40 homes in the Yakima Valley in Washington State where 61 dairy CAFOs operate. Airborne contaminants were found in significantly greater levels at homes near dairy CAFOs. The study

concluded that dairy operations increase community exposure to pollutants with known human health effects (App. p. 11).

The Plaintiffs attached to their Complaint, as Exhibit 1, a more complete list of studies and articles relating to pollution from AFOs (App. p. 20-36). These resources are publicly available and would have been available to the EPA. Many of these studies were funded by and/or submitted to EPA. EPA has therefore known about these studies for years, but the agency has taken no action to regulate these pollutants from AFOs.

### SUMMARY OF THE ARGUMENT

42 U.S.C. § 7604 authorizes a citizen suit under the Clean Air Act against the EPA for failure to perform any non-discretionary act or duty, or to compel action unreasonably delayed.

Based on a solid body of scientific evidence over many years, the EPA knows that air pollution, primarily from ammonia and hydrogen sulfide, from animal feeding operations endanger public health and welfare. 42 U.S.C. §§ 7408 and 7409, provide that any air pollutant and any stationary source, respectively, that in the judgment of the EPA endangers public health and welfare must be listed as regulated pollutants and sources under the Clean Air Act.

The issue in this case is whether the "endangerment findings" in §§ 7408 and 7409 are discretionary to the extent that a citizen suit is precluded. It is clear that the provision in the statutes for listing air pollutants and stationary sources "from time to time" is mandatory. If the "endangerment finding" is discretionary, the mandatory directive of the statutes would be rendered a nullity. Therefore, the EPA's failure to make the required listings as set forth by the Plaintiffs is action unreasonably delayed.

The district court granted the EPA's motion to dismiss based on the premise that the "endangerment finding" is discretionary, and therefore a citizen suit is not available to the Plaintiffs. For the reasons stated above, that ruling is in error and should be reversed by this Court.

## ARGUMENT

## I. THE DEFENDANTS HAVE A NONDISCRETIONARY DUTY TO LIST AMMONIA AND HYDROGEN SULFIDE AS REGULATED POLLUTANTS AND TO LIST AFOs AS STATIONARY SOURCES UNDER THE CLEAN AIR ACT.

## A. Standard of Review

Granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is inappropriate unless the Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. This Court

11

reviews the district court ruling de novo. The Court must accept the Plaintiffs' factual allegations as true and construe the complaint liberally, granting Plaintiffs the benefit of all inferences that can be derived from the facts alleged. At this stage of the proceedings, the Court does not assess the truth of what is asserted or determine whether the Plaintiffs have any evidence to back up what is alleged in the Complaint. All that is required is that the Plaintiffs give the Defendants fair notice of what the Plaintiffs' claim is and the grounds upon which it rests. Inferences must be supported by facts set out in the Complaint and the Court need not accept legal conclusions cast in the form of factual allegations. <u>Browning v. Clinton</u>, 292 F.3d 235 (D.C. Cir. 2002).

**B. Statutory and Regulatory Framework**

Section 108 of the Clean Air Act, 42 U.S.C. § 7408, sets out the requirements for establishing and regulating criteria pollutants:

   (a)   Air Pollutant List; publication and revision by Administrator; issuance of air quality criteria for pollutants.

   (1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant –

12

> (A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;
>
> (B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and
>
> (C) for which air quality criteria had not been issued before December 31, 1970, but for which he plans to issue air quality criteria under this section.

An air pollutant is broadly defined as "any air pollution agent or combination of such agents, including any physical, chemical, biological . . . substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant. . . ." 42 U.S.C. § 7602(g).

Section 109 of the Clean Air Act, 42 U.S.C. § 7409, which comes into play after the listing of criteria pollutants pursuant to Section 108, provides:

(a) Promulgation.

> (1) The Administrator –
>
>> (A) within 30 days after the date of enactment of the Clean Air Amendments of 1970, shall publish proposed regulations prescribing a national primary ambient air standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date of enactment; and
>>
>> (B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days

13

after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

(2) With respect to any air pollutant for which air quality criteria are issued after the date of enactment of the Clean Air Amendments of 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

(b) Protection of public health and welfare.

(1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

(2) Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

* * * * * * * * * * * * * * *

(c) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions.

(1) Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 108 [42 U.S.C. § 7408] and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 108 and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

Section 111 of the Clean Air Act, 42 U.S.C. § 7411,

sets out the requirements for designating and listing

stationary sources of air pollutants that must be regulated

by the EPA:

(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards.

(1)(A) The Administrator shall, within 90 days after the date of enactment of the Clean Air Amendments of 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health and welfare.
    (B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish

15

proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate.

A stationary source is defined as "any building, structure, facility, or installation which emits or may emit an air pollutant." 42 U.S.C. § 7411(a)(3).

To determine whether a particular air pollutant or stationary source meets the endangerment standard required by §§ 108 and 111, the EPA must take into account its effect on public health and welfare. While public health is not defined in the Clean Air Act, the legislative history defines the term broadly. See, American Lung Ass'n. v. EPA, 134 F.3d 388 (D.C. Cir. 1998). The Clean Air Act clarifies welfare and states that:

> [a]ll language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

42 U.S.C. § 7602(h).

The citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604, provides:

16

> (a) Authority to bring civil action; jurisdiction. Except as provided in subsection (b), any person may commence a civil action on his own behalf –
> **************
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator,
> **************

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 307(b)[42 U.S.C. § 7607(b)] which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 307(b)[42 U.S.C. § 7607(b). In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

## C. Argument

### 1. Non-Discretionary Duty

Plaintiffs make two claims in this case. First, Plaintiffs claim that EPA has a non-discretionary duty to list ammonia and hydrogen sulfide as criteria pollutants under the Clean Air Act. Although animal feeding operations emit other air pollutants, ammonia and hydrogen sulfide are the primary pollutants affecting human health, so the Plaintiffs are asking that only those two pollutants be

17

listed. Second, Plaintiffs claim that EPA has a non-discretionary duty to list animal feeding operations as stationary sources of air pollution under the Clean Air Act.

Thus, the Plaintiffs claim that EPA has a non-discretionary duty to list the specific pollutants and stationary source, not just to undertake some action. The aforementioned studies conclusively prove that ammonia and hydrogen sulfide and animal feeding operations must be listed as criteria pollutants and stationary sources, respectively. The facts presented in the studies impose a non-discretionary duty on EPA under the Clean Air Act.

There is no question that pursuant to §§ 108 and 109 of the Clean Air Act, 42 U.S.C. §§ 7408 and 7409, EPA has a non-discretionary duty to list pollutants that may reasonably be anticipated to endanger public health and welfare, and to establish ambient air quality standards for such pollutants.

Likewise, § 111 of the Clean Air Act, 42 U.S.C. § 7411, imposes on EPA a non-discretionary duty to designate animal feeding operations as stationary sources of air pollution.

Section 108, 42 U.S.C. § 7408, clearly says that EPA "shall" list pollutants that may reasonably be anticipated

18

to endanger public health or welfare; § 109, 42 U.S.C. § 7409, clearly says that EPA "shall" adopt regulations regarding such pollutants; and § 111, 42 U.S.C. § 7411, clearly says that EPA "shall" list stationary sources of air pollution that may reasonably be anticipated to endanger public health or welfare. The law is firmly established that use of the word "shall" creates a mandatory duty. See, Bennett v. Spear, 520 U.S. 154, 175, 117 S.Ct. 1154 (1997); Allied Pilots Ass'n. v. Pension Benefit Guar. Corp., 334 F.3d 93, 98 (D.C. Cir. 2003).

Plaintiffs bring this action as a citizen suit pursuant to 42 U.S.C. § 7604. Section 7604(a)(2) authorizes any person to bring a civil action against the EPA for failure to perform any non-discretionary act or duty under the Clean Air Act, including action unreasonably delayed. The language of the statute is clear that it is not limited to violation of a time-certain deadline. Indeed, as the district court found, the statute covers either a failure to meet a deadline or unreasonable delay in carrying out a duty (App. p. 41).

Plaintiffs' claims are that the EPA has a non-discretionary duty, "from time to time," 42 U.S.C. §§ 7408, 7409 to revise the list of air pollutants and stationary sources that may reasonably be anticipated to endanger

19

public health and welfare. Identical language in other
Clean Air Act statutes has been addressed by the courts as
a non-discretionary duty unreasonably delayed. See, <u>Center
for Biological Diversity v. EPA</u>, 794 F.Supp.2d 151 (D.D.C.
2011); <u>Friends of the Earth v. EPA</u>, 934 F.Supp.2d 40
(D.D.C. 2013).

**2. EPA's Duty to Make Endangerment Findings**

The EPA's argument to the district court, as well as
the basis for that court's ruling, boils down to the
allegation that the endangerment finding that precedes the
requirement to revise the listing of criteria pollutants
and stationary sources under the Clean Air Act is a
discretionary act that cannot be challenged by a citizen
suit under 42 U.S.C. § 7604. This question has been
considered in two cases in the district court with directly
opposite results. <u>Center for Biological Diversity v. EPA</u>,
794 F.Supp.2d 151 (D.D.C. 2011); <u>Friends of the Earth v.
EPA</u>, 934 F.Supp.2d 40 (D.D.C. 2013).

In <u>Friends of the Earth v. EPA</u>, supra, the court
looked primarily to the text of the statute at issue in
that case, 42 U.S.C. § 7571(a)(2)(A), to determine that the
endangerment finding is not a non-discretionary act. But
the court's analysis does not really support its
conclusion. First, the court admits that Congress did not

clearly separate the phrase concerning the endangerment finding from the mandatory word "shall" using any grammatical separation, such as punctuation. "When several words are followed by a clause which is applicable as much to the first and other words as the last, the natural construction of the language demands that the clause be read as applicable to all." Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348, 40 S.Ct. 516 (1920).

Nor does the statute use a conditional sentence, such as "if the Administrator finds in his judgment that any air pollutant causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare, then it shall issue emission standards." Friends of the Earth supra at 48. Instead, the statute uses the word "which." The court concluded, therefore, that "it is not clear that Congress intended to establish the making of endangerment findings as a mandatory duty, and the language also falls short of a clear indication that Congress intended to designate it to be a discretionary activity." Id. at 49.

The court then confronted the EPA's argument (the same argument it makes in this case) that the phrase "in his judgment" creates a discretionary action. The court did not agree with this argument. The court said:

21

> While the use of "in his judgment" reveals that
> Congress sought to assign the agency the
> responsibility to judge or determine which pollutants
> belong to the category the agency is required to
> regulate, it does not signal that Congress necessarily
> gave the agency complete discretion over whether and
> when to make that determination. The provision states
> that the Administrator shall issue standards
> applicable to the emission of "any air pollutant . . .
> which in his judgment causes . . . ." The decision
> committed to agency expertise is the substance of the
> determination – whether an air pollutant meets the
> criteria – and the word "judgment" appears to be
> simply a synonym for decision or determination. Thus,
> the sentence has the same meaning as if it said "which
> he finds" or "which he determines." So, the text of
> the statute alone does not clearly indicate that
> making the determination is only a discretionary duty.

Id. at 49.

This position comports with the decision in other cases interpreting §§ 108, 109, and 111, or sections of the Clean Air Act with similar structures, that the existence of language affording an agency some discretion over its regulatory decisions does not render discretionary a clear mandatory duty to conduct rulemaking. In Environmental Defense Fund v. Thomas, 870 F.2d 892 (2d Cir. 1989), for example, plaintiffs sought to compel EPA to revise the NAAQS for sulfur dioxides under Section 109(d) of the Clean Air Act. That section provided that "the Administrator shall complete a thorough review of the criteria published under Section 108 . . . and promulgate such new standards as may be appropriate." Id. at 895 (emphasis added). In

22

that case, much as it does here, EPA argued that the phrase "as may be appropriate" gave it discretion "simply not to address the issue with a formal public opinion." <u>Id</u>. at 898. The Court of Appeals for the Second Circuit rejected that argument, holding that "[t]he words 'as may be appropriate' clearly suggest that the Administrator must exercise judgment and the presence of 'shall' in the section implies only that the district court has jurisdiction to order the Administrator to make <u>some</u> formal decision whether to revise the NAAQS, the content of that decision being within the Administrator's discretion." <u>Id</u>. at 898-899; see also, <u>Am. Trucking Ass'ns. v. EPA</u>, 175 F.3d 1027, 1047 (D.C. Cir. 1999)(adopting the Second Circuit's reasoning regarding mandatory duty from <u>Am. Lung Ass'n v. Reilly</u>, 962 F.2d 258, 262-263 (2d Cir. 1992), which cited <u>Envtl. Def. Fund v. Thomas</u>, with approval); <u>Sierra Club v. Leavitt</u>, 355 F.Supp.2d 544, 549 (D.D.C. 2005)(holding that a statutory clause that provides an agency flexibility in determining the substance of a regulation does not nullify a clear mandatory duty).

The court in <u>Friends of the Earth</u> then seems to misapprehend the structure of the statute creating the EPA's duty. The court acknowledged that the requirement to revise the listings "from time to time" creates a

23

meaningful standard for judicial review of unreasonable delay cases. Id. at 51. Furthermore, in footnote 5, the court stated that it was not suggesting that it was the vagueness of the phrase "from time to time" that allegedly makes the endangerment finding discretionary. Rather, it was the court's view that a chain of inferences and intrusion on agency discretion are required to establish a deadline for the endangerment finding.

It is not clear from the court's opinion what inferences would have to be made to establish a deadline. And a proper construction of the statute makes the endangerment finding non-discretionary if the mandatory intent of the statute is to be carried out. The Plaintiffs submit that if the requirement of revising the statutory listings "from time to time" is, as the court said in Am. Lung Ass'n. v. Reilly, 962 F.2d 258 (2d Cir. 1992), a meaningful standard on which to judge unreasonable delay, a court can determine whether the delay is unreasonable based on the specific facts of each case.

What the court in Friends of the Earth misapprehended, however, is that the EPA cannot carry out its non-discretionary duty to revise the lists of pollutants and stationary sources "from time to time" without making an endangerment finding. Therefore, it is obvious that the

24

endangerment finding must also be made "from time to time" in order for the listings, as required, to be made "from time to time." And as the court conceded in Friends of the Earth, that phrase establishes a "meaningful standard for judicial review" in unreasonable delay cases. Therefore, it does in this case, as well.

The decision of the Second Circuit in NRDC v. Train, 545 F.2d 320 (2nd Cir. 1976), although distinguishable in many respects from this case, is illustrative in demonstrating the correct analysis for interpreting the statute in this case. In Train, the EPA argued that it did not have to list lead as a criteria pollutant under the Clean Air Act because § 108(C) mandates listing for any pollutant "for which [the Administrator] plans to issue air quality criteria." The EPA's argument was that since the EPA did not intend to issue air quality criteria for lead, it did not have to list lead as a criteria pollutant. In other words, the EPA argued that it had the discretion not to list lead as a pollutant.

The Train court held that the EPA's interpretation of the statute was "contrary to the structure of the Act as a whole, and that if accepted, it would vitiate the public policy underlying the enactment of the 1970 Amendments as

25

set forth in the Act and in its legislative history." Id.
at 324. The Train court went on:

> Section 108(a)(1) contains mandatory language. It
> provides that "the Administrator shall . . . publish .
> . . a list . . . ." (Emphasis added). If the EPA
> interpretation were accepted and listing were
> mandatory only for substances "for which [the
> Administrator] plans to issue air quality criteria . .
> .", then the mandatory language of § 108(a((1((A)
> would become mere surplusage.

Id. at 324-325. This analysis applies equally to the
requirement for the endangerment finding at issue in this
case.

The district court cited Train for the proposition,
limited to the facts of that case, that once EPA has
decided that pollutants meet the requirements for listing,
it must list them. That is not the point of the Plaintiffs
citing Train. We acknowledge that the facts in Train are
distinguishable. The significance of the Train decision,
which the district court did not address, is the holding
that a provision in a statute that appears to be
discretionary is not discretionary if the structure of the
statute is mandatory, and treating one aspect as
discretionary would defeat the mandatory intent of the
statute.

The court in Friends of the Earth then purported to
consider the structure and purpose of the statute at issue.

26

But in doing so, the court relied on the opinion in Sierra Club v. Thomas, 828 F.2d 783 (D.C. Cir. 1987). But the Thomas case is not relevant. The Thomas case addressed the law as it was in 1987, when district courts had jurisdiction of a violation of a non-discretionary duty where there was a date-certain deadline, but courts of appeals had jurisdiction pursuant to the Administrative Procedure Act of all unreasonable delay cases. But, as the Defendants themselves explained in their brief in the district court, the citizen suit provision of the Clean Air Act was amended in 1990 to give district courts jurisdiction over unreasonable delay claims.

The court in Friends of the Earth cited the statement in Thomas that a non-discretionary duty is one that is clear-cut and involves a ministerial act. The court then went on to say that if the duty is not clear-cut and simply ministerial, it is an issue that must be presented to the Court of Appeals. Of course, this analysis overlooks the fact that when Thomas was decided, the district courts had no jurisdiction over unreasonable delay cases. Now they do. And the court in Friends of the Earth acknowledged that the phrase "from time to time" is sufficient to give rise to an unreasonable delay claim and that the phrase "in his

27

judgment" does not make the endangerment finding discretionary.

Therefore, the Plaintiffs believe the <u>Friends of the Earth</u> case was not correctly decided.

The other pertinent case is <u>Center for Biological Diversity v. EPA</u>, supra. That case, just as with <u>Friends of the Earth</u>, alleged EPA's failure to list pollutants pursuant to 42 U.S.C. § 7571(a)(2)(A). The court in <u>Center for Biological Diversity</u> found that treating the endangerment finding as a discretionary act would defeat the purpose of the statute "by allowing EPA to shirk its duty to combat air pollution." <u>Id.</u>, 794 F.Supp.2d at 159-160. The court correctly concluded that the relevant paragraph could not be read in a vacuum, but must be read with reference to the rest of the statute.

The court in <u>Center for Biological Diversity</u> was simply following the guidance from the Supreme Court and the Court of Appeals for the D.C. Circuit. In construing a statute, "the [statutory] language itself, the specific context in which that language is used, and the broader context of the statute as a whole" must be examined. <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341, 117 S.Ct. 843 (1997). A court should use "all traditional tools of statutory interpretation, including text, structure,

28

purpose, and legislative history, to ascertain Congress'
intent . . . ." Nat'l. Cable & Telecomms. Ass'n. v. FCC,
567 F.3d 659, 663 (D.C. Cir. 2009).

But construction of the statutory language "does not
end here, but must continue to 'the language and design of
the statute as a whole.'" Am. Scholastic TV Programming
Found. v. FCC, 46 F.3d 1173, 1178 (D.C. Cir. 1995)(quoting
Fort Stewart Sch. V. FLRA, 495 U.S. 641, 645, 110 S.Ct.
2043 (1990). See also, Roberts v. Sea-Land Servs. Inc., 132
S.Ct. 1350, 1357 (2012); Bell Atl. Tel. Cos. v. FCC, 131
F.3d 1044, 1047 (D.C. Cir. 1997). A court must also
"exhaust the traditional tools of statutory construction,
including examining the statute's legislative history to
shed new light on congressional intent, notwithstanding
statutory language that appears superficially clear."
Sierra Club v. EPA, 551 F.3d 1019, 1027 (D.C. Cir. 2008).

As discussed previously, the entire language and
thrust of §§ 7408, 7409 and 7411, are mandatory, using the
word "shall." If the endangerment clause were
discretionary, the mandatory commands to list pollutants,
establish emission standards, and list stationary sources
"from time to time" would be meaningless since those
mandatory duties cannot be accomplished without an
endangerment finding. In other words, if, as the EPA

29

argues, it does not have to ever make an endangerment finding, it would never have to list pollutants, establish emission standards, or list stationary sources, a position clearly at odds with the mandatory intent of the statutes. EPA is arguing, therefore, that it is free to flout the will of Congress.

It is also important to determine legislative history, as did the court in Center for Biological Diversity, along with the language of the statute. Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 851-853, 862-864, 104 S.Ct. 2778 (1984); Aid Ass'n. for Lutherans v. U.S. Postal Serv., 321 F.3d 1166, 1176-78 (D.C. Cir. 2003). The 1977 amendments to the Clean Air Act pertaining to the endangerment finding were a response to the decision in Ethyl Corp. v. EPA, 541 F.2d 1 (D.C. Cir. 1976), where the court said that the Clean Air Act "and common sense . . . demand regulatory action to prevent harm, even if the regulator is less than certain that harm is otherwise inevitable," as quoted in Massachusetts v. EPA, 549 U.S. 497, 506, n. 7, 127 S.Ct. 1438 (2007). So, the 1977 amendments were designed to make it clear that the Clean Air Act "demand[s] regulatory action." A "demand" for regulatory action indicates that Congress intended a mandatory duty.

30

The legislative history of the 1970 amendments to the Clean Air Act was also relied upon in NRDC v. Train, supra, to determine that EPA's duty to list lead as a criteria pollutant was mandatory. The Train court noted that the Clean Air Act Amendments of 1970 were a reaction by Congress to the lack of progress in combating air pollution under the prior law.

Applicable to this case, Congress made the following statement in explaining the Clean Air Act Amendments of 1970:

> Air pollution continues to be a threat to the health and well-being of the American people. While a start has been made in controlling air pollution since the enactment of the Air Quality Act of 1967, progress has been regrettably slow. This has been due to a number of factors: . . . (6) last, but not least, failure on the part of the National Air Pollution Control Administration to demonstrate sufficient aggressiveness in implementing present law. . . . Therefore, it is urgent that Congress adopt new clean air legislation which will make possible the more expeditious imposition of specific emission standards both for mobile and stationary sources and the effective enforcement of such standards by both State and Federal agencies.

U.S. Cong. & Admin. News, V. 3, p. 5360 (1970).

It is significant that the EPA in the district court did not provide any analysis of the Center for Biological Diversity case as the Plaintiffs have done here. The EPA in its Memorandum simply said in footnote 8 at p. 13 that it believes the Center for Biological Diversity case was

31

wrongly decided, as if the EPA's unsupported opinion was sufficient argument for the court.

It should be clear from the foregoing that the EPA's reliance on the Friends of the Earth case is unjustified. Plaintiffs submit that the Friends of the Earth case was incorrectly decided for the following reasons:

a. The court said in a footnote that a chain of inferences was required to establish a deadline for agency action. However the court acknowledged that "from time to time" is sufficiently definite to determine unreasonable delay, citing Am. Lung Ass'n. v. Reilly, supra. So it is not clear what inferences would have to be made to determine unreasonable delay. A court would simply need to consider the facts of the case and determine if the delay is unreasonable, just as in an unreasonable delay case under the Administrative Procedure Act.

b. The court also said in the same footnote that establishing a deadline would intrude upon agency discretion and impinge on the agency's ability to organize its operations. But again, granting relief under § 7604 would be no different than granting relief for unreasonable delay under the Administrative Procedure Act, which would also

32

arguably intrude upon agency discretion and impinge on the agency's ability to organize its operations. Furthermore, when § 7604 authorizes district courts to grant relief for violation of non-discretionary duties, including unreasonable delay, it is clear that Congress intended for courts to intrude upon agency decisions to that extent.

c. The court commented that to grant relief a court would have to infer a duty to make an endangerment finding from the overall statutory framework. But that is exactly what a court is required to do, as explained above. That is the essence of statutory construction.

d. The court seemed to believe that a court is limited under § 7604 to compelling a ministerial act or correcting a clear-cut default. This position is clearly at odds with the language of § 7604, which gives a district court the authority to decide unreasonable delay claims.

e. The court stated that only the Court of Appeals has jurisdiction to determine unreasonable delay claims. In support of that position, the court cited cases that were decided under the law prior to the 1990 amendments giving jurisdiction to the

district courts over unreasonable delay cases under the Clean Air Act.

f.  It is also significant that in <u>Friends of the Earth</u> the plaintiffs had filed a petition for rulemaking with the EPA and EPA formally responded to that petition. The parties agreed that EPA's response was final agency action. Since final agency action is to be reviewed by the Court of Appeals in the first instance, the district court found that the case should have been presented to the Court of Appeals. In the case before this Court, there has been no attempt at rulemaking, so obviously, the EPA has not taken any action that would place jurisdiction with the Court of Appeals.

g.  The court also seemed to infer that the means to require the EPA to fulfill its duty to list pollutants and sources is a petition for rulemaking. However, there is nothing in §§ 108, 109 and 111 of the Clean Air Act that requires a petition for rulemaking to ensure that the EPA carries out its duties. The terms and construction of the statutes themselves require the EPA to revise the lists of pollutants and sources "from time to time." When the agency fails to make those

34

required revisions, it has violated the statute.

That is why Congress authorized citizen suits under

§ 7604.

So, for all of the reasons set forth above, the Plaintiffs respectfully submit that the <u>Friends of the Earth</u> case was incorrectly decided and is not applicable to the facts and issues in this case.

**3. The Decision of the District Court**

The district court should have undertaken the analysis to confront the issues raised by the <u>Friends of the Earth</u> and <u>Center for Biological Diversity</u> cases. The district court cited the <u>Friends of the Earth</u> case but made no mention of the <u>Center for Biological Diversity</u> case. As explained above, the <u>Friends of the Earth</u> court actually agreed with the basic premises of the Plaintiffs' argument, but declined for unsupported reasons to make the final determination that EPA had a non-discretionary duty to take the action mandated by the statute in question. The <u>Center for Biological Diversity</u> case, on the other hand, made the unassailable conclusion that allowing the EPA to never make an endangerment finding would render the mandatory intent of the statute a nullity.

The district court also suggested that the Plaintiffs' remedy is a petition for rulemaking. That suggestion is

35

misplaced. A petition for rulemaking to require the listing of pollutants or a stationary source would still have the endangerment finding as a prerequisite. And based on the holding of the district court, that would still be a discretionary act that, if you accept the logical conclusion of the court's analysis, the EPA would never have to perform. As determined by the courts in <u>Train</u> and <u>Center for Biological Diversity</u>, such a conclusion would destroy the mandatory duty clearly expressed in the statutes.

It is also clear that absolutely nothing in § 7604 requires a petition for rulemaking, or any other prerequisite in order for Plaintiffs' to have a claim for a citizens suit for unreasonable delay. In any event, petitions for rulemaking have been filed. A petition was filed in April of 2011, requesting that ammonia and hydrogen sulfide be listed as criteria pollutants. See, www.centerforfoodsafety.org/files/petitionammonia-as-criteria-pollutant04062011_59802.pdf. Also, a petition was filed in September of 2009, requesting that CAFOs be listed as stationary sources under the Clean Air Act. See, www. Foe.org/sites/default/files/HSUS_et_al_v_EPA_CAFO_CAA_ Petition.pdf. To the best of the Plaintiffs' knowledge the EPA has made no attempt to address those petitions. This

36

proves that the district court's reliance on a petition for rulemaking is an ineffective proposal.

The district court also mentioned in passing the question of whether the Plaintiffs could request that EPA be required to list specific pollutants and a specific stationary source, or whether the most the court could order is that the EPA make some decision, rather than a specific decision. The evidence in this case is that scientific studies are so clear over many years that AFOs must be regulated under the Clean Air Act that the EPA cannot justifiably say that not listing AFOs and their pollutants would be a matter of discretion. At this point, in determining a motion to dismiss, it cannot be said that there is no set of facts that would not entitle the Plaintiffs to the relief they request. To paraphrase the recently deceased Senator Howard Baker, discovery will determine what the EPA knew and when they knew it. If it is an absolute fact that AFOs and their pollutants endanger public health and welfare, the statutes mandate that listings be made.

### CONCLUSION

In this case EPA argues that it has the discretion to never comply with the congressional mandate to periodically revise the list of air pollutants and emission sources

37

subject to the Clean Air Act. As shown by the cases discussed above, EPA habitually grasps words and phrases from various statutes that it claims grant it discretion to do as it pleases. But the overall context and structure of the statutes in question in this case, as well as the legislative history, make it clear that EPA does not have the discretion it claims to have. EPA simply wants the power to disobey the will of Congress and to fail to protect people like the Plaintiffs who are subject to the well-documented air pollution from AFOs.

This is not a case where the agency has initiated rulemaking and is just taking too long to complete the task. In this case a rule listing ammonia and hydrogen sulfide as criteria pollutants and listing AFOs as stationary sources is not even a glimmer in the agency's eye. EPA's inaction is stark in light of the studies and data regarding the health impacts of AFO air pollution going back to the 1990's, as confirmed by the references in Plaintiff's complaint and Exhibit 1 attached thereto.

At this point, in ruling on a motion to dismiss, the motion should be granted only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006). In that

38

light, we do not know when or if EPA intends to undertake a listing, why EPA claims it has not yet undertaken this rulemaking, and other pertinent facts that would be obtained during discovery. The Plaintiffs have alleged facts more than sufficient to withstand a motion to dismiss.

For all of the reasons set forth herein, this Court should reverse the decision of the district court and remand the case to that court for further proceedings.

/s/ *Wallace L. Taylor*

WALLACE L. TAYLOR
Law Offices of Wallace L. Taylor
118 3rd Ave. S.E., Suite 326
Cedar Rapids, Iowa 52401
319-366-2428;(Fax)319-366-3886
e-mail: wtaylorlaw@aol.com

ATTORNEY FOR PLAINTIFFS-APPELLANTS

## CERTIFICATE OF SERVICE

I Wallace L. Taylor, attorney for the Appellant, certify that I mailed, by United States Mail with first class postage affixed, 8 copies of this Appellant's Brief, to the Clerk of Court, 333 Constitution Ave NW, Room 5205, Washington, D. C., 20001-2866, on the 27 day of October, 2014.

The undersigned certifies that a copy of the foregoing was served electronically on the counsel of record who are registered with the Court's ECF system on the 27 day of October, 2014.

/s/ *Wallace L. Taylor*
_____
WALLACE L. TAYLOR

## CERTIFICATE OF COMPLIANCE

I, Wallace L. Taylor, attorney for the Appellant, certify that this Appellant's Brief complies with the page limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

/s/ *Wallace L. Taylor*
_____
WALLACE L. TAYLOR

40